512 P.2d 658

**AMERICAN GYPSUM TRUST, a common law trust, et al., Plaintiffs and Respondents,**

v.

**GEORGIA–PACIFIC CORPORATION, a Utah corporation, et al., Defendants and Appellants.**

No. 12887.

Supreme Court of Utah.

July 16, 1973.

George W. Latimer, Keith E. Taylor and Roy B. Moore, of Parsons, Behle & Latimer, Salt Lake City, for appellants.

Dennis McCarthy, Clifford L. Ashton, and C. Keith Rooker, of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Ken Chamberlain, of Olsen & Chamberlain, Richfield, for respondents.

HENRIOD, Justice:

Appeal from a judgment in a case tried to the court for breach of a mining lease. Affirmed, with modification, the parties to bear their own costs.

A 50-year lease with option to renew was executed in 1946 by plaintiff's predecessor, lessor, and one Eliason, lessee, who in turn was defendant's predecessor, fourth removed. The pertinent provisions in this case were: 1) to pay as royalty and rentals a) 11 cents per ton of material removed, b) a minimum annual payment of $15,000 for a time, then $12,000, deductible from the tonnage rental if the latter exceeded those amounts; 2) an added rental of 7% of the net profit of lessee on products manufactured with the gypsum and sold in the market, the per cent determinable according to "sound accounting principles in the gypsum industry," the lessee to keep accurate records; and 3) providing that "all gypsum requirements of the lessee *or his assigns* shall be supplied from the demised premises," and that in connection with the lease, the lessee was required to build a plant at Sigurd, Utah, for the manufacture from gypsum of building material (wallboard), agreeing that the operation would be "carried on in a prudent and businesslike manner *for all interests concerned.*"

The defendant lessee by assignment in 1965 concedes that it is saddled with such provisions and conditions; further that for 20 years the plant operated and produced a net income for the lessor, which for many years (at least for 7 of the 20 years immediately preceding defendant's take-over) resulted in a seven-per-cent-of-net-profit on a sales to consumer formula, in rental payments averaging $90,000 to the plaintiff under previous lessees. Further, it appears that thereafter, under defendant's operation and control, and for several years, there was a constant withering of plaintiff's rental income,—during which time the defendant did not deign to complain to the plaintiff about the accounting formula theretofore employed. Plaintiff simply contends that defendant's breach of the lease as to marketing practices and bookkeeping departures caused the vanishing rental income.

Thus, for about a quarter century and for about half the life of the lease, by consent and uncontroverted ratification of four predecessor lessees not objected to by the defendant as to method, the formula determining the 7% net profit rental was recognized by condescension and silence and not attacked on the basis of unsound paper work, and we cannot discount such eventualities and cannot recognize the ensuing renunciation of the formula as easily as urged by defendant.

In 1967 defendant acquired a gypsum processing plant in Lovell, Wyoming. Prior thereto defendant's predecessors sold their Sigurd manufactured products exclusively in states west of the Continental Divide and became the traditional suppliers in that "historical" geographical area,[1] to the exclusion so far as invasion of the market by defendant is concerned and before taking over, in which defendant sold very little. No one seemed to bother about this, because of inconsequential competition, until defendant's own interpretation of the lease—which interpretation suggests a free trade and laissez-faire policy, irrespective of the terms of the lease, in a competitive operation between apparently itself and itself, by pitting its owned gypsum operation at Lovell against its unowned but controlled one at Sigurd. The believable facts reasonably could have been interpreted by the trial court to justify its conclusion, not in harmony with that suggested by the defendant. Furthermore, on such evidence, defendant not only dedicated Lovell to furnishing a substantial part of the western market, but added part of a Texas plant's output, and that of other subsidiaries,—also wholly owned by defendant,—to competition with and to the deterioration of plaintiff's source of rental income. Under the evidence it is not unbelievable that defendant was the parent beneficiary of its subsidiaries to the damage of plaintiff, by injecting them as substitutes for Sigurd into an area where for nearly a quarter of a century its predecessors had built up a virtual noncompetitive market, so far as defendant was concerned, —not by fraud or force but by the circumstances that defendant nor anyone else, for that matter, sought to compete seriously, until defendant bought the lease. The trial court so concluded on what we think was a proper appraisal of the facts reflected in the record,—all of which contributed to the decline in plaintiff's rental income,—to the point where a previous seven-year average $90,000 rental income precipitously was re-

1. Plaintiff's complaint initially claimed defendant should be required to take from Sigurd all gypsum it needed, under the terms of the lease, but amended it to restrict its claim to that area west of the Rockies. Had it not, it would have been somewhat inconsistent with its thesis in this case, and unrealistic under the restricted facts within its power to prove, and would have bumped head-on with the Chancellor.

duced during a three-year stewardship of defendant to about one-sixth of such annual rental, or about $14,000 per annum compared with $90,000,—slightly more than the $12,000 minumum, which defendant claims is its optimum obligation under the lease, and with which we and the trial court do not agree.

After defendant took over the lease, and after it had not questioned the bookkeeping for several years, it employed a brand new accountant who made a recommendation that defendant adopted, which recommendation constituted an equally brand new, unilateral and different kind of bookkeeping that would and did eliminate rental income save for the minimum annual and tonnage rate, to the exclusion of the 7% net profit factor. This percentage, according to the new accountant and his theory, resulted totally in nothing to plaintiff after 20 some odd years of a different kind of accounting procedure which former formula universally had been agreed to by the lessor and four lessees,—defendant's legal ancestors. There is ample evidence in the record that this unusual and unrealistic departure may have been attributable to the following factors in varying degrees: 1) a setoff against net profits for an alleged intercompany sale or so-called "transfer" charge to an intercompany subsidiary instead of to the ultimate consumer, as had been the approved formula, or 2) to a savings by using materials from a wholly owned company property, like Lovell, free from the shackles of a leasehold with a requirement that all the lessee's gypsum needs would be furnished under the lease, a minimum annual rental, 11 cents tonnage burden and a 7% net profit rental; and/or 3) the competition that destroyed in part the traditional Sigurd market.

The claimed market invasion, a novel accounting procedure not used before, defendant's contention that the "requirements" provision in the lease was impotent, and that defendant's only obligation was to pay the $12,000 ground rental, all demonstrably unpalatable not only to the language of the lease, but more nearly to the Gypsum Trust, the plaintiff here, provoked the following points on appeal:

Defendant says that the trial court erred: 1) in finding No. 27 that the defendant was obligated to operate the Sigurd plant at not less than the average 1965–67 production level, provided only that it "has sufficient market to sell 128,539,000 square feet" of material (wallboard, etc.) in the western states, "i. e., the historic market area of Sigurd as reflected in plaintiff's Exhibit 1."; 2) that historically the Sigurd plant has furnished the states west of the Continental Divide with its market requirements for gypsum products; 3) that the plaintiff's accountant's testimony as to damages was admissible; and that 4) appellant had departed from

the accounting practices of the lease and agreed upon by the lessees.

As to 1): We are constrained to agree with G–P as to Finding 27 which goes so far as to say that under the "Requirements" provision of the lease G–P a) "is obligated to operate the Sigurd Plant (annually) at not less than" 128,539,000 square feet, b) provided G–P "has a sufficient market to sell that quantity in Sigurd's "historic market area"[2] of states west of the Rockies.

We can find nothing in the "requirements" clause to justify its interpretation in support of such conclusion as to a) above. There is nothing mentioned therein about a minimum or fixed annual plant output in any one year or a formula for future years. The only provision in the lease that even remotely suggests such a conclusion is that portion that says that its operation would be "carried on in a prudent and businesslike manner for all interests concerned," which conceivably, in a given set of circumstances, because of continued losses by the lessee, and under any accounting formula, could mean that the interests of the lessee negatively being concerned, one of two things might evolve: 1) a continued but perhaps lesser loss by the required payment of the $12,000 annual minimum rental, lacking a profitable market, or 2) a forfeiture of the lease by the lessor or damages for its breach, if the minimum were not paid.

■ As to b): that part of Finding 27 requiring the minimum future plant output if G–P "has a sufficient market to sell that quantity of gypsum in the *historic market area* of Sigurd," there also is nothing in the clause justifying such conclusion. So far as the market area is concerned, the plaintiff, by amendment, restricted itself to the area of sale and the rental income from sales therein by the lessee, and forever is stuck with it, as pointed out in footnote No. 1, supra. We believe and hold that the evidence justifies the conclusion that the original parties had in mind that the application of the lease was confined to the area west of the Rockies,—fully substantiated by a quarter century adherence and customary geographical restriction,— which may be considered under elementary contract principles to be a factor for determining intention of the parties. Saying so, we affirm the trial court's Finding of Fact No. 8, and may as well and do decide defendant's Point II on appeal as being without merit, saying that before and after this litigation sales of gypsum products made by G–P or any of its subsidiaries, such as Lovell, or other controlled agencies in the historic western states area must be products manufactured with gypsum materials taken from lessor's mining properties, sub-

2. Finding No. 8, treated under Point II on appeal.

**12**

ject to the 7% net profit provision, calculated by the accounting method approved by lessor, four lessees before G–P, by G–P itself for a couple of years, the trial court, and now this court.

The terminology in Finding 27 that the income under the lease would be determinable if G–P "has a sufficient market" in the western market found by the trial court is calculated to provoke perennial litigation, and there is nothing in the lease to justify such provocation. There could be a market in the area, but G–P may not want to enter it because it might be quite unprofitable. The Finding's fallacy is an interdiction to use a market in the area if there is one. All we can glean out of the lease is that if there *is,* G–P and/or its subsidiaries ·or other agency under its direct or indirect control, or its successors, choose to enter and make sales in it, there is a duty absolute to use Sigurd ore and pay tribute to the lessor according to the leasehold's terms as stated above. So being, Finding 27 is held to be not only irrelevant to the facts but irreverent to the leasehold.

■■ Our conclusion as to Finding 27, therefore, is that it is not supported by the wording of the requirements of the lease or the facts, as to either of its two facets. The only provision which appears to be germane here is the seven-per-cent-of-net-profit provision, which by letter agreement executed by the then lessor and lessee in 1957 was clarified and substituted by a 10% "charge for selling, advertising and administrative expense"—all of which brings us to Point III on appeal to the effect that the trial court erred in admitting plaintiff's accountant's testimony of accounting methods to determine lessor's income from the lease because he testified as to market trends and practices. The trial court noted the difference in type of expert testimony and said he would take it into account and that he did not know just how he would appraise the testimony after admitting it on a pro forma basis. The conclusion of this court is that, considering the record as a whole, there may have been a lack of expertise as to marketing but considerable knowledge with respect to sound accounting principles, that if believed by the trial court, survived the test of the parties' agreement, acquiescence, a quarter century of time, and the erudition of accountants employed by four predecessor lessees, and one accountable to defendant to its perhaps economic displeasure. Thereafter defendant hired a new one to change all that alleged unreason. Suffice it to say we consider the record amply to be supportive of admissibility of enough sufficient and substantial plaintiff's testimony about sound accounting practices as to compel affirmance of the trial court's conclusion in that respect as applied to the lease.

■ What we have said above resolves defendant's Point 4) on appeal as being without merit as it applies to any claim of prejudice. There seems to be ample evidence that defendant departed from an accounting formula employed for many years by the parties. The new accounting system adopted by G–P seems designed to eliminate the burdens of the lease provisions, and bookkeep the transactions through a so-called distribution center, alter ego of defendant, to make a profit for both the center and G–P and thus eliminate a formula by substituting another to water down royalties based on profits on sales to the consumer. Defendant suggests that such a system of dealing with figures somehow can justify destruction of a prior $90,000 annual rental payment with the claim that it not only owed plaintiff nothing but that the former actually owed it something.

We conclude that the money judgment of the trial court be and it hereby is affirmed, as is the rest thereof, including that portion sustaining the accounting procedure reflected in Exhibits 139–141, but excepting that portion of the "requirements" portion of the lease discussed hereinabove. That part is reversed with instructions to modify the same in consonance with the observations and opinion stated here.

■ With respect to the use of the years 1965–67 as a basis for the money judgment, we think that because of evidence reasonably showing inaccessibility of records under the discovery process, the trial court, using available, admissible evidence, fairly appraised the situation as to amounts due under the lease,—possibly even in defendant's favor, as not to have been unsupported by past records, but conservative and just to both sides of this case.

■ Plaintiff, in a cross-appeal, asked for attorney's fees. We affirm the trial court's denial thereof. Defendant was required to defend against a claim for paper used in the manufacture of gypsum products by defendant, which claim was based on an accounting method urged by plaintiff, against which the trial court found, determining that in that instance defendant's proposed accounting procedure was correct,—which among other things justified the trial court's ruling.

Parenthetically, and without committing anyone else, this writer confesses to a ventured suggestion directed to both sides, whether a settlement might be effected, but counsel creditably were wedded to their clients' interests, to their dedicated positions and honest beliefs, and understandably were disinclined to indulge such luxury.

CALLISTER, C. J., and TUCKETT, J., concur.

ELLETT, Justice (concurring and dissenting):

To me, this case involves nothing more than the interpretation to be placed upon a lease contract drawn by the plaintiffs' attorney. That contract required defendants' predecessor to erect a mill on the land now owned by the plaintiffs[1] and to take all ore to be used therein from the leased land and to pay therefore eleven cents per ton (as of now) together with seven percent of the net profit earned by the plant. There was a provision in the contract that the lease payments would not be less than $12,000 per year.

The lease further provided that the seven percent of net profit would be based upon "sound accounting principles and practices in the gypsum industry" and that in the event of any disagreement between the parties with reference thereto, "the parties shall be bound by the final determination of the Bureau of Internal Revenue for Federal Income Tax purposes for the year in which the dispute arises."

Later the parties entered into an agreement providing that the deductions for selling, advertising, and administrative expenses and purchase discounts would be ten percent of the gross profit.

I am unable to see any provision in the lease which would require the lessee to operate at any given rate of production or to sell its products in any given market.

The agreement seems to me to be clear that if the lessee wishes to close the plant for whatever reason, its lease cannot be terminated so long as the minimum rental of $12,000 per year is paid.

The trial court was convinced that the market for wallboard in the Pacific states belonged to the mill on the lessors' ground, and when wallboard from other plants of the lessee was sold there, it was a violation of the rights of the lessors under the contract.

The present lessee has plants all over the United States, and when it can produce and ship its products from a plant at a cheaper price than it can from the plant here involved, it is a matter of its own concern.

The judgment of the trial court required the lessees to produce 128,539,000 square feet of wallboard per year for the duration of the lease so long as there are mineable and processable reserves and a sufficient market in the eleven western states to absorb the production.

This holding is neither justified nor required by the terms of the lease, and I concur with the main opinion in reversing as to this.

1. Both plaintiffs and defendants are successors to the rights and liabilities created by this contract, and the parties and their predecessors will be referred to as lessors (plaintiffs) and lessees (defendants).

I do not agree, however, that the court correctly assessed the damages of lessors by failure of the lessees to pay the seven percent. The judgment of the trial court required the lessees to take paper manufactured in another one of its subsidiary plants and furnish it to the local plant at cost, thus allowing no profit to the stockholders of the corporation owning the other plant. It seems that there is a genuine dispute as to the method of accounting in arriving at gross profit, and it is my opinion that the amount of gross profit shown on the income tax returns for the years in dispute and accepted by the Bureau of Internal Revenue should be used and the net profit ascertained by deducting therefrom ten percent as provided for in the contract and modifying letter. If the income tax return is so merged in intercompany consolidated returns that the true gross profit of the local plant cannot be ascertained, then I think the gross profit should be determined under the guide lines which the Bureau of Internal Revenue would approve if no consolidated return was made.[2]

I, therefore, would reverse the case and remand it for a determination of the amount of money, if any, due to the lessors, and whether there has been an overpayment by the lessee. I also agree that each party should bear its own costs on this appeal and would let the question of attorney's fees abide the final result of the litigation.

CROCKETT, J., concurs in the views expressed in the concurring and dissenting opinion of ELLETT, J.

---

**2.** I do not know what type of return was filed with the Internal Revenue Service. It is to be noticed that one of the plaintiffs, S. Lewis Crandall, was at the time of making the lease an auditor for the Internal Revenue Service and remained such for many years until his retirement.